1  John T. Hansen (CA34639)
   jhansen@nossaman.com
2  James H. Vorhis (CA245034)
   jvorhis@nossaman.com
3  Nossaman LLP
   50 California Street, 34th Floor
4  San Francisco, CA 94111
   Telephone: 415.398.3600
5  Facsimile:  415.398.2438

6  Attorneys for FEDERAL DEPOSIT INSURANCE
   CORPORATION as Receiver for Integrity Bank

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| MHG CASA MADRONA HOTEL, LLC, | Case No: 09-12536 |
|---|---|
| Debtor, | **REPLY MEMORANDUM OF THE FDIC RE MOTION FOR RELIEF FROM STAY OR IN THE ALTERNATIVE TO DISMISS THE CASE**<br><br>Date: October 2, 2009<br>Time: 10:00 a.m. |

The Federal Deposit Insurance Corporation (FDIC), as receiver of Integrity Bank, submits the following reply memorandum to debtor's opposition to the FDIC's motion for relief from the automatic stay or in the alternative to dismiss the case. This memorandum is supported by the declarations of Charles P. Farrell, Jr. ("Farrell Dec.") and Lily Schinsing ("Schinsing Dec.") filed and served herewith.

## I. SUMMARY

In its opposition the debtor raised essentially three issues, each of which is either factually erroneous or legally unsupported. Those issues and the FDIC's response are:

1. Debtor asserts that in effect it only borrowed $12,000,000 from Integrity Bank notwithstanding executing a note in the principal amount of $29,550,000. This assertion is false, as shown by the Reply Declaration of Charles P. Farrell, Jr. and Exhibits CFR 1 and 2 attached thereto. In fact debtor drew down the entire $29,550,000 amount of the note. [1] In addition, two entities (Melbourne Hotel and Printers Row/Blake) controlled by Guy Mitchell, the debtor's principal, obtained loans from the bank which were funded in the aggregate amount of $19,148,034. In 2007, the bank cancelled those delinquent notes and allowed Mr. Mitchell to replace them with notes from the debtor secured by the Casa Madrona Hotel.

2. Debtor asserts that the 2007 restructuring was intended to be a "walk away" arrangement and that bank officers deceived or otherwise falsely induced the debtor to assume additional debt and then failed to perform the "walk away" part of the arrangement. This assertion fails for these reasons: a) no such agreement ever existed in final and enforceable form; b) it is not a defense to an action by the FDIC

---

[1] In its opening memorandum the FDIC stated that no payments were ever made on account of the note. This statement was technically incorrect. An accurate statement would be that the debtor never made a payment on the note from sources independent of the note itself. On several occasions the debtor drew funds under the note and used those funds to make interest payments. (Farrell Dec., Exh. CFR 2). However, the debtor never made a principal payment; nor did it pay any interest or principal after June 2007 (Farrell Dec., ¶4.)

241158_1.DOC 2 Case No. 09-12536

pursuant to 12 U.S.C. 1823(e); and c) any non-performance of the alleged agreement was caused by the debtor's and Mr. Mitchell's inability to satisfy the requirements of the alleged arrangement.

3. Debtor asserts that the FDIC "most likely approved" of the 2007 restructuring. This assertion also fails for at least three reasons: a) if true, it would be irrelevant, because the debtor and Mr. Mitchell in fact knowingly executed all the loan documents and obligated the debtor to repayment of the original $29,550,000 note and the two replacement notes, b) debtor has produced no evidence of the FDIC's alleged approval of the transaction and c) the FDIC never actually approved the transaction.

Each of these issues will be discussed in greater detail below.

## II. ALL LOANS SECURED BY THE CASA MADRONA HOTEL WERE FULLY FUNDED.

Debtor contends that only $12,000,000 of the May 2005 $29,550,000 note from debtor to Integrity Bank (Exhibit A to Declaration of Guy Mitchell in Support of Opposition ["Mitchell Dec."]) was drawn upon or disbursed (Opposition to Motion for relief from Stay ["Opp."] 4). This assertion is demonstrably false. The entire amount of the note was drawn down over a period of two-plus years, as shown on the Loan History Record, attached to the Declaration of Charles P. Farrell, Jr., as Exhibit CFR 1.[2] The last draw was on June 29, 2007, and thereafter no payments were made on account of interest or principal (Farrell Dec., ¶4).

As part of the June 2007 restructuring, debtor assumed additional indebtedness by executing two "replacement notes" These notes replaced notes from two Mitchell-controlled entities, which in turn were cancelled by the bank.[3] It does not appear that Debtor contends

---

[2] Each of the draws or disbursements is recorded with the code number "31" in the second column from the left. Those disbursement entries are further noted in handwriting in the far left column as "A" through "FF."

[3] Mr. Mitchell customarily personally guaranteed the loans from Integrity Bank to the entities he controlled. A reasonable inference may be drawn that he had guaranteed the two cancelled notes. He was asked at the meeting of creditors whether he had guaranteed the two cancelled notes, but he did not know the answer.

that these notes do not represents funds actually paid to the entities in question. Debtor contends it received no consideration for assuming these obligations. However, they were assumed as part of the June 2007 settlement or restructuring agreement pursuant to which the bank agreed to forebear from collection pending final consummation of the restructuring agreement. Indeed, Mr. Mitchell, recognized that factor in the Indemnification Agreement he signed contemporaneously with the June 26, 2007 letter (Supplemental Declaration of John T. Hansen, Exhibit JTH 4). There Mitchell stated:

> "[B]oth Mitchell and Casa Madrona will receive significant and material benefit from the forbearance by the Bank ...."

In any event the debtor is clearly obligated for the full amount of the May 2005 $29,550,000 note, plus interest since June 2007 to August 9, 2009. Whether debtor received adequate consideration for the replacement notes assumed in 2007 is somewhat academic, because the balance due on the original note exceeds the value of the hotel (regardless of which value is accepted) by several multiples.

### III. DEBTOR HAS OFFERED NO ADMISSIBLE EVIDENCE THAT INTEGRITY BANK AGREED THAT DEBTOR COULD "WALK AWAY" FROM THE INDEBTEDNESS SECURED BY THE HOTEL. NOR WOULD THE FDIC BE BOUND BY ANY SUCH AGREEMENT AS DESCRIBED BY MR. MITCHELL.

**A.  There is no admissible evidence that the bank agreed to allow the debtor to "walk away" from the indebtedness secured by the hotel.**

In his declaration, Mr. Mitchell states that "I entered into a settlement agreement with the Bank *in principal*, in which the Bank and I and my related entities agreed *in essence* to a walk away from claims against each other...." (Mitchell Dec., p. 3, ¶ 9; emphasis added). He further states that the letter dated June 26, 2007 "summarizes the transaction that the Bank used to structure what I thought was a walk away." (*Id.*, ¶ 10). Other than the June 26, 2007 letter (Mitchell Dec., Exhibit D), Mr. Mitchell offers no evidence that the bank agreed to a "walk away," other than his belief as to the nature of the transaction. No bank officers who made

such a promise are identified and no written consummated agreement to that effect has been identified or produced.

The June 26, 2007 letter does not support Mr. Mitchell's contention. On its face, the letter states that it is only a "letter of intent. (Exhibit D, p. 1). Part B of the letter is entitled **"LETTER OF INTENT FOR FUTURE ACTIONS"** (*Id., p. 2)*, and it goes on to say that "The Bank and you have *tentatively* agreed to the following action and *will negotiate* during the forbearance period the consummation of the following:...." (*Id.*, emphasis added*)*. Hence the July 26, 2007 letter is a classic "agreement to agree" and does not constitute an enforceable agreement. *See, Kreimer v. Kreimer*, 274 Ga 359, 363, 552 S.E.2d 826 (2001).

Of equal importance, Mr. Mitchell offers no evidence that he or the debtor ever performed the obligations described on page 3, in paragraph 2, and a search of the bank's records has revealed no indication that the complete list of required items was ever provided. (Farrell Dec., ¶7) As to the final, and probably most important item, the documents relating to the condominium conversion, debtor undoubtedly failed to furnish those documents, because no application for a condominium conversion was ever submitted to the City of Sausalito. (Schinsing Dec. ¶1) Hence, the key element of the so-called walk away never materialized.

In short there apparently was an intent on the part of the bank and Mr. Mitchell to negotiate some form of debt forgiveness in exchange for the debtor surrendering the hotel as a condominium-conversion project, but the agreement was never finalized or consummated through no apparent fault of the bank.

**B.    The evidence in fact shows no "walk away" agreement was entered into.**

It is apparent that debtor has produced no evidence of a final, signed and board-approved agreement to allow debtor and other Mitchell entities to walk away from their obligations to the bank. The simple reason is that there is none. The FDIC has caused a review of the bank's records and it has found no final, definitive agreement that can be described as a "walk away" agreement (Farrell Dec., ¶6). A review of the bank's board of directors minutes for the period time in question reveals that the board had approved in

principle the concept of taking a deed in lieu for the hotel from the debtor and forming a new entity to develop the hotel as condominiums (*Id.*, ¶8).

The last reference to the concept was included in the August 15, 2007 board minutes, where the following occurred:

> "A motion was made by Mr. Peden, seconded by Mr. Murphy, to approve the list of documents to be sent to Mr. Mitchell for execution, to continue the use of West Paces to manage the day-to-day operation of the Casa Madrona Hotel for the time being, and to form a new LLC for the Casa Madrona Hotel, owned by Integrity Bank. Motion carried."

(*Id.*, Exhibit CFR 3). There is no record that Mr. Mitchell was sent or signed and returned documents of the type referred to in the Minutes (Farrell Dec., ¶7). After that the concept appears to have been dropped. In short, there was a general intent, considerable negotiation, but no execution of a "walk away" agreement by the parties.

**C.** **The FDIC cannot be bound by an informal agreement of a bank for which it is the receiver.**

Debtor may contend that nonetheless it had obtain a promise from (so far unnamed) bank officers to agree to a walk away. Such an understanding, however would not be binding on the FDIC. Section 1823(e) of Title 12, United States Code, provides in pertinent part, as follows:

> "No agreement which tends to diminish or defeat the right, title or interest of the Corporation [FDIC] in any asset acquired by it under this section ... shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been continuously, from the time of its execution, and official record of the bank."

This section was interpreted by the Supreme Court in *Langley v. Federal Deposit Insurance Corporation*, 484 U.S. 86, 108 S.Ct. 396 (1987). There the Court described the reasons for the statute and the broad scope of the term "agreement" as used in the statute. It also addressed and rejected an argument, similar to the one advanced here, *i.e.*, that the bank misled the debtor and that the FDIC knew of the transaction. The Court said,

> Petitioners' fallback position is that even if a misrepresentation concerning the existing fact can sometimes constitute an agreement covered by § 1823(e), it at least does not do so when the misrepresentation was fraudulent and the FDIC had knowledge of the asserted defense at the time it acquired the note. We conclude, however, that neither fraud in the inducement nor knowledge of the FDIC is relevant to the section's application.

********

> Petitioners are really urging us to engraft an equitable exception upon the plain terms of the statute. Even if we had the power to do so, the equities petitioners invoke are not the equities the statute regards as predominant. While the borrower who has relied upon an erroneous and even fraudulent unrecorded representation has some claim to consideration, so do those who are harmed by his failure to protect himself by assuring that his agreement is approved and recorded in accordance with the statute. Harm to the FDIC (and those who rely upon the solvency of its fund) is not avoided by knowledge at the time of acquiring the note.

484 U.S. at 93-95; 108 S.Ct. at 402-403. Thus, even if there was some unwritten agreement to allow the debtor to walk away from its obligations to Integrity Bank, it does not defeat the FDIC's claim.

**D.  The FDIC did not approve a "walk away" transaction.**

Debtor contend that "[t]he FDIC most likely approved the June 26, 2007 agreement" (Opposition 4). Debtor offer no evidence of this assertion, and the facts are otherwise. It is true that the FDIC had conducted an examination of the bank during the time in question, and was aware of the proposed transaction, as reflected in an excerpt from the FDIC's report of examination dated October 23, 2007 (Farrell Dec., Exhibit CFR 6). Nothing in the report suggests the FDIC "approved" the transaction. Furthermore, the August 8, 2007,

241158_1.DOC 7 Case No. 09-12536

minutes of the board of directors makes it clear that the bank understood that it would have to have a final approval from the FDIC before proceeding with the proposed transaction and that such approval had not been forthcoming as of that date (Farrell Dec., Exhibit CFR 5). However, as the Supreme Court noted in *Langley v. FDIC,* supra, even the FDIC's knowledge would not defeat its claim unless the agreement was formalized and approved by the board, something that never happened.

### IV. DEBTOR'S PLANS TO REORGANIZE DEFIES REALITY.

Debtor states that it plans to reorganize by borrowing sufficient funds to pay off the FDIC the value of its secured claim, and that Mr. Mitchell will make a capital contribution in order to provide a distribution to unsecured creditors. This plan is at best "pie in the sky." For the past two years, the hotel has been operated at a very substantial deficit. During this period no property taxes have been paid, no debt service on the Integrity bank loan has been paid (even at the alleged $12,000,000 level which debtor wrongly asserts is all that is owed), and unsecured claims in excess of $400,000 have accumulated. Debtor does not explain how it can support a new loan if it was unable to support the Integrity Bank loan at any level. Moreover, debtor would be taking over control of the hotel in an extremely depressed market (Selna, R. "Hotel losses mount, hurting city's coffers." SFGate.com. August 24, 2009, retrieved September 24, 2009 from http://www.sfgate.com/cgibin/article.cgi?f=/c/a/2009/08/24/MNBU19ACV5.DTL [copy attached]).

Apparently Mr. Mitchell wishes to retain an interest in the hotel without paying the unsecured creditors in full. It is unclear how he intends to satisfy the criteria of the "new value exception" to the absolute priority rule. See, *Bank of America v. 203 No. LaSalle Street Partnership,* 526 U.S. 434 (1999).[4]

---

[4] Over the past several months, the FDIC has received numerous inquiries regarding the disposition of the Casa Madrona Hotel, and over 25 interested parties were present at the continued trustee's sale on August 10, 2009. Mr. Mitchell should not be afforded an exclusive

1     If reorganizing is going to be as simple as Mr. Mitchell suggests, it is unclear why he did not take steps to reorganize this debtor earlier, at a time when the hotel business was less distressed. The answer no doubt is that the type of funding needed was not and most likely is not available; at least at any price the debtor can afford.

## V. CONCLUSION

    For the reasons stated above and in the FDIC's moving papers, the FDIC's motion for relief from the stay or in the alternative to dismiss the case should be granted. The debtor simply does not make a credible case for denial of the motion and continuance of this hopeless case.

Dated: September 25, 2009

Nossaman LLP

By: _____
    John T. Hansen

Attorneys for FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for Integrity Bank

---

right to retain his equity interest in the debtor. Furthermore, there is no indication that the debtor intends to proceed against Mr. Mitchell to recover the distributions he made to himself during a time when the hotel was insolvent and not paying its creditors. Any plan that failed to provide s for such a recovery over the objection of the creditors would not be fair and equitable.

241158_1.DOC                                9                                  Case No. 09-12536

SFGate.com | Print This Article | Back to Article
SFGate.com

advertisement | your ad here



# Hotel losses mount, hurting city's coffers

Robert Selna, Chronicle Staff Writer

Monday, August 24, 2009

 

After two notable and high-end San Francisco hotels defaulted on large loans last month, the city's hotel economy - a key contributor to municipal coffers - has only become bleaker.

On July 8, owners of the stately, 97-year-old Renaissance Stanford Court on Nob Hill defaulted on an $89 million loan. Three weeks later, the glitzy Four Seasons Hotel, built on Market Street in 2001, withheld payment on $90 million it owed.

The explanation for the ailing hotel industry is straightforward: High unemployment and job insecurity have meant that patrons aren't willing to pay as much as they have in recent years. In June, the average room rate in San Francisco was $134, the lowest it has been since 2005 and well below the $162 peak in June 2008, according to PKF Consulting, which tracks hotel industry trends.

For a while, managers filled rooms by offering lower rates, but the number of visitors also has begun to slide, and in June, occupancy tumbled to 73 percent, down from 85 percent the same time last year.

Add to the troubled mix the fact that many hotel owners, in San Francisco and across the state, financed purchases or refinanced loans between 2005 and 2007 - when the hotel values were at their peak. Since then, hotels statewide have lost 50 to 80 percent of their value, meaning that many owners owe far more than their asset is worth.

Hospitality industry analyst Alan Reay calls the situation a "perfect storm" that won't improve any time soon - probably not until 2011.

"We won't hit the bottom on this until we see stabilization in employment and income," said Reay. "Plummeting revenue and an inordinate amount of debt on these properties is a recipe for disaster."

## More defaults expected

Seven San Francisco hotels are currently in default, but Reay and others expect more defaults in the coming months and believe that some hotels will go into foreclosure. Apart from the Stanford Court and Four Seasons, the distressed hotels have confidentiality agreements that keep their identities private.

Alongside the owners who can't pay off their loans, it appears the city itself has taken the biggest loss as a result of the hotel slump. Data from the San Francisco Controller's Office shows that the city's hotel-related revenue is expected to decline by 9 percent in 2008-2009 to $203 million and to drop to $173 million in 2009-2010.

Ted Egan, San Francisco's chief economist, said hotel occupancy taxes and property taxes comprise about 7 percent of annual revenues that go to the city's general fund, the highest amount from the private sector. The next biggest tax contribution from private industry comes from payroll taxes, but they typically represent less than half of hotel taxes, he said.

Nearby destinations also are suffering. Based on the key indicator of revenue per rooms available, San Francisco and Oakland were down 24 percent from the previous June and the San Jose/Campbell area has plummeted 32 percent, according to numbers compiled by Reay's Atlas Hospitality Group.

Smaller California towns that rely heavily on tourism also have seen established hotels flail. For example, the owners of Sausalito's turn-of-the-century Casa Madrona Hotel recently filed for bankruptcy after defaulting on a $24 million loan.

## Rates fall nationwide

The problem is not limited to California. For example, the average price for a Manhattan hotel room now is about $200 a night, down almost one-third since last year.

Hotel companies (as opposed to owners) are relatively sheltered from the real estate disaster, Reay said. Many hotels are no longer owned by companies bearing the hotel's name, such as Marriott and Hilton, but instead are managed by them. The Stanford Court is an example.

While cheaper rooms are a boon to visitors, some hotels have had to cut services to correspond with declining rates. Room service may no longer run all night and fewer staff may be on hand to ensure a comfortable stay.

Scott McCoy, Stanford Court's general manager, said the hotel had "calibrated services with the expectations of guests" and had made some changes, but that it was essentially the same hotel.

E-mail Robert Selna at rselna@sfchronicle.com.

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2009/08/24/MNBU19ACV5.DTL